**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

|  |  |
|---|---|
| ONA S. RED HAT and LEO RUNEARTH, | |
| Plaintiffs, | No. 11-CV-41-LRR |
| vs. | **ORDER** |
| CRST VAN EXPEDITED, INC., n/k/a CRST EXPEDITED, INC., | |
| Defendant. | |

_____

### *TABLE OF CONTENTS*

*I.*     *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *PROCEDURAL HISTORY*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*III.*   *SUBJECT MATTER JURISDICTION*. . . . . . . . . . . . . . . . . . . . . . *3*

*IV.*   *SUMMARY JUDGMENT STANDARD*. . . . . . . . . . . . . . . . . . . . *3*

*V.*     *RELEVANT FACTUAL BACKGROUND*. . . . . . . . . . . . . . . . . . . *4*
      *A.*     *Parties*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*
      *B.*     *Pre-Employment Training and Expenses*. . . . . . . . . . . . . . . . . *4*
      *C.*     *Employment Contracts*. . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
      *D.*     *Red Hat's Training Period with Thomas Hinsdale*. . . . . . . . . . . *7*
      *E.*     *Report of Hinsdale's Sexual Harassment*. . . . . . . . . . . . . . . . *9*
      *F.*     *Plaintiffs' Post-Training Driving and End of Employment*. . . . . . *10*

*VI.*   *ANALYSIS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
      *A.*     *Sexual Harassment*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
            *1.*    *Applicable law*. . . . . . . . . . . . . . . . . . . . . . . . . . . *12*
            *2.*    *Term, condition or privilege of employment*. . . . . . . . . . . *14*
            *3.*    *Coworker vs. supervisor*. . . . . . . . . . . . . . . . . . . . . *14*
                 *a.*    *Whether Lead Driver is a supervisor*. . . . . . . . . . . *15*
                 *b.*    *Whether CRST knew or should have known of the harassment and failed to take proper action.* . . . . . . . *17*
                 *c.*    *Affirmative defense*. . . . . . . . . . . . . . . . . . . . . . *18*

    B.       *Racial Harassment*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**
    C.       *Retaliation*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**
    D.       *Breach of Contract*. . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
    E.       *Promissory Estoppel*. . . . . . . . . . . . . . . . . . . . . . . . . . . **27**
    F.       *Iowa Wage Payment Collection Law*. . . . . . . . . . . . . . . . . . **28**
    G.       *Retaliatory Discharge*. . . . . . . . . . . . . . . . . . . . . . . . . . **29**

**VII.**   **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

# I. INTRODUCTION

The matter before the court is Defendant CRST Van Expedited, Inc.'s ("CRST") "Motion for Summary Judgment" ("Motion") (docket no. 26). In the Motion, CRST argues that it is entitled to summary judgment on all of Plaintiffs' claims pled in the Amended Complaint ("Complaint") (docket no. 20).

# II. PROCEDURAL HISTORY

On October 18, 2011, Plaintiffs Ona S. Red Hat and Leo Runearth (collectively, "Plaintiffs") filed a seven-count Complaint against CRST. Count I alleges that Red Hat was subjected to sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.[1] Count II alleges that Red Hat was subjected to racial harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. Count III alleges that CRST retaliated against Red Hat for her report of harassment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. Count IV[2] alleges that CRST breached its employment contracts with Plaintiffs. Count V alleges that CRST made promises to Plaintiffs and those promises must be enforced under the doctrine of promissory estoppel. Count VI alleges that CRST failed to pay Plaintiffs the wages due to them in violation of the Iowa Wage Payment

---

[1] Plaintiffs mistakenly cite to Title VII in Counts I and II as 28 U.S.C. § 2000.

[2] Plaintiffs improperly number this count as a second Count III in the Complaint. Therefore, the court will consider this Count IV and renumber subsequent counts accordingly.

Collection Law, Iowa Code chapter 91A. Count VII alleges that CRST discharged Runearth in retaliation for Red Hat's report of harassment in violation of public policy. On October 28, 2011, CRST filed an Answer (docket no. 23) to the Complaint, in which CRST denied Plaintiffs' allegations and asserted affirmative defenses.

On June 20, 2012, CRST filed the Motion. On July 16, 2012, Plaintiffs filed a Resistance (docket no. 33). On July 25, 2012, CRST filed a Reply (docket no. 36). Neither party requested a hearing, and the court finds that a hearing is unnecessary. The matter is fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has federal question subject matter jurisdiction over Counts I, II and III because they arise under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over Counts IV, V, VI and VII because "the federal-law claims and state-law claims in the case derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (alteration in the original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (internal quotation marks omitted); 28 U.S.C. § 1367.

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert.*

*denied*, 132 S. Ct. 1144 (2012) . "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010). "To survive a motion for summary judgment, the nonmoving party must substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V.  RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Plaintiffs and affording them all reasonable inferences, the uncontested material facts are as follows.

### A.  Parties

Plaintiffs, a married couple, are citizens of Oklahoma. Plaintiffs were employed as over-the-road truck drivers at CRST from approximately October 22, 2009 to December 16, 2009. Plaintiffs are of Native American descent.

CRST is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa. CRST is an interstate logistics and transit company that employs long-haul drivers. CRST uses an efficiency model known as "team driving," in which two drivers are assigned to a truck and alternate between sleeping on board the truck and driving to maximize mileage and minimize stops.

### B.  Pre-Employment Training and Expenses

Prior to signing employment contracts with CRST, CRST paid for Plaintiffs to attend driving school at Kirkwood Community College in Cedar Rapids. CRST also advanced funds to Plaintiffs to pay for lodging, transportation and pre-employment

physicals and drug screenings.

On October 19, 2009, Plaintiffs attended a CRST orientation, during which they learned about the company's policies, including its harassment policy. Red Hat signed an acknowledgment that stated:

> I ACKNOWLEDGE I have received and read CRST Van Expedited's Policy Against Unlawful Harassment and Discrimination. I understand that CRST Van Expedited does not tolerate any form of harassment or discrimination at work, including sexual harassment, and any employee who is found to have violated the Policy will [b]e subject to appropriate disciplinary action up to and including termination. . . .
>
> I also understand and agree that if I believe I am being subjected to harassment or discrimination, no matter how severe or pervasive, I will immediately report it to my fleet manager or to the Human Resources Department directly so that I may be removed from the harassing situation and so that CRST may conduct a prompt investigation.

Red Hat Acknowledgment, Defendant's Appendix ("Def. App'x") (docket no. 26-2) at 49. Red Hat also testified during her deposition that she received a copy of CRST's harassment policy and that the policy was covered during the orientation.

### C. Employment Contracts

Plaintiffs signed employment contracts with CRST on October 22, 2009. The contracts each state that Plaintiffs will be employed for a term of eight months and be employed on an at-will basis thereafter. Regarding termination of employment, the contracts state:

> During the Term[,] Employee's employment may be terminated only for the following reasons[:] (1) by CRST with or without Due Cause effective immediately, (2) by mutual agreement of CRST and Employee, or (3) upon the death of the Employee[.] For the purposes of this Contract, "Due Cause" means Employee's breach of this Contract and/or Employee's failure to satisfy or comply with any of the

> standards, requirements, obligations and conditions set forth in
> the Handbook.

Red Hat Employment Contract, Def. App'x at 68; Runearth Employment Contract, Def. App'x at 71. The contracts also contain the following regarding reimbursement for advances:

> Student acknowledges and agrees that CRST advanced on
> behalf of Employee, in accordance with the Pre-employment
> Driver Training Agreement, the payment of certain tuition,
> lodging, transportation and other expenses and fees incurred
> by Employee in the course of Employee participating in the
> Driver Training Program . . . sponsored by CRST[.]

Red Hat Employment Contract, Def. App'x at 69; Runearth Employment Contract, Def. App'x at 72. The contracts go on to state that CRST will make deductions from the employee's paycheck starting in the second week of phase 4 of the driver training program to repay fees and expenses advanced to the employee during phase 1 of the driver training program. The contracts further state:

> If during the Term either (1) Employee breaches this Contract,
> or (2) Employee's employment is terminated for Due Cause,
> then Student will owe and immediately must pay to CRST the
> following sum[:] (i) $3,950 plus (ii) the amounts advanced by
> CRST on behalf of Student . . . for Student's DOT physical
> and drug screen expenses, Lodging Cost and Transportation
> Cost incurred during Phase 1 that Student has not yet repaid
> via deductions from weekly pay pursuant to this section 7(a),
> plus (iii) interest accruing as of the Effective Date at a rate
> equal to the lesser of 1.5% per month or the maximum rate
> permitted by applicable federal and state usury laws[.]
> Employee hereby authorizes CRST to deduct the amount due
> under this section . . . , if any, from the compensation
> amounts otherwise due to Employee . . . upon the termination
> of Employee's employment[.]

Red Hat Employment Contract, Def. App'x at 69-70; Runearth Employment Contract, Def. App'x at 72-73. The contracts further state that they are governed by Iowa law.

## D. Red Hat's Training Period with Thomas Hinsdale

As part of the driver training program, new CRST drivers are required to complete twenty-eight days of over-the-road training with a Lead Driver. Lead Drivers instruct driver trainees on the proper way to drive CRST's vehicles, monitor their progress and evaluate them at the conclusion of the training period. Lead Drivers can make recommendations at the end of the training period that influence management decisions regarding the trainees, but Lead Drivers do not have the authority to hire, fire, promote, demote or reassign trainees.

Before starting her over-the-road training, Red Hat was speaking with her assigned Lead Driver when Thomas Hinsdale approached them. Hinsdale corrected Red Hat's Lead Driver on his knowledge of road rules, and Red Hat asked Hinsdale to be her Lead Driver. Hinsdale then spoke to the dispatcher and became Red Hat's Lead Driver.

Hinsdale informed Red Hat of the rules of his truck before departing for the training period. One of Hinsdale's rules was that, for her protection, Red Hat had to hold his hand whenever the two went to a truck stop and pretend that they were a couple. Red Hat told Hinsdale that she could take care of herself and would not hold his hand. At this point Red Hat still believed that Hinsdale was looking out for her and did not interpret his rule as harassment at the time. Red Hat did not report Hinsdale's rule about holding hands to anyone at CRST.

During the beginning of Red Hat's training with Hinsdale, both Hinsdale and Red Hat were suffering from head colds. Hinsdale offered Red Hat Nyquil, which Red Hat refused to take because she did not want the medicine to make her drowsy. Red Hat did not report Hinsdale's offer of Nyquil to anyone at CRST.

At some point during Red Hat's training period with Hinsdale, Hinsdale made derogatory remarks about dark-skinned drivers of other vehicles, calling them "slow-ass Mexicans" and "dumb-ass Mexicans" during conversations with his dispatcher. Hinsdale

also referred to a dark-skinned female customer as a "bitch" and other derogatory names even though Red Hat had no problems dealing with the customer.

Between November 9 and November 11, 2009, Hinsdale touched Red Hat's hair, rubbed her shoulders and shared sexual jokes with her that he had received on his cellular phone. Red Hat told Hinsdale to stop telling her sexual jokes, and he complied. Hinsdale also told Red Hat that CRST stands for "constantly raping student truckers" and told her that it was acceptable to cheat on her husband. Hinsdale also embarrassed Red Hat by making a scene in a truck stop and acting as though they were a couple. Hinsdale would also yell at Red Hat to use his quarters for her laundry, not to leave the truck unless he was leaving the truck and not to sign up for a shower unless he was there.

Red Hat called Runearth, who was training with a different Lead Driver at the time, and told him about the things Hinsdale said to her. Runearth told Red Hat to call her dispatcher, but she did not want to call anyone because Hinsdale had told her that the dispatchers were his friends and that they would "have his back no matter what anyone told them." Red Hat Deposition, Def. App'x at 14. Red Hat told Runearth that she just wanted to finish her training so that she could drive with him and that she did not want any trouble. Red Hat also told Tony Stanolis, another trainee driver, about how Hinsdale was treating her. When Stanolis told Red Hat to report Hinsdale to her dispatcher, Red Hat again said that she just wanted to finish her training. Red Hat also told another trainee driver, Cindy, about Hinsdale's actions.

On November 11, 2009, in the early morning, Red Hat woke up to find Hinsdale standing over her and touching her backside. Red Hat screamed at Hinsdale and asked him what he was doing, and he turned around quickly and said that he was "putting [her] sock back on [her] bunk." Red Hat Deposition, Def. App'x at 15. Red Hat then ran to the truck stop and tried to contact Runearth. When she couldn't reach Runearth, Red Hat called Stanolis. Stanolis told Red Hat that she needed to report Hinsdale and that he would

report the incident if she did not. Red Hat was then able to reach Runearth, who also told Red Hat to call her dispatcher.

### E. Report of Hinsdale's Sexual Harassment

At approximately 10:30 P.M. on November 11, 2009, Red Hat called her dispatcher, Patrick Ralph, and reported Hinsdale's harassment. Ralph then put Red Hat through to Todd Wright, the Operations Director. Red Hat reported the harassment to Wright, and Wright told Red Hat that he wanted to get her away from the truck. Red Hat told Wright that she had only a few dollars, so Wright told her that CRST would get her a hotel room and pay for a taxi to take her to the hotel. Wright told her that someone from Human Resources would contact her in the morning. Red Hat went to a hotel as directed by Wright. CRST paid for the taxi and the hotel.

The next morning, Lisa Oetkin from CRST Human Resources called Red Hat, spoke to her regarding the harassment and asked her to fill out an incident report. Later that day, Red Hat retrieved her belongings and log book from Hinsdale's truck and took a Greyhound bus to meet her new female Lead Driver, Robyn Seigler. Red Hat drove with Seigler for the remainder of her training, and Red Hat reported no problems with Seigler. Seigler typed out Red Hat's handwritten incident report regarding Hinsdale's harassment, and Red Hat faxed the report to Oetkin. Oetkin then conducted an investigation and disciplined Hinsdale by putting a letter in his file and preventing him from training female drivers. Oetkin informed Red Hat of the results of the investigation and the discipline Hinsdale received. Red Hat testified that CRST removed her from the harassing situation and conducted a prompt investigation and that she was satisfied with the way CRST handled the report. Red Hat Deposition, Def. App'x at 33-34.

Seigler recommended to CRST management that Red Hat be allowed to end her training before the Thanksgiving holiday even though she had not driven the required number of miles so that she could start driving with her husband after the holiday. CRST

approved this recommendation, and Plaintiffs had approximately six days of rest over the holiday before starting to drive together.

### F. Plaintiffs' Post-Training Driving and End of Employment

Plaintiffs began driving together as co-drivers on December 2, 2009, and drove four loads together before their employment with CRST ended on December 16, 2009. Red Hat and Runearth were assigned to fleet manager Chris O'Shea, who had no knowledge of Red Hat's report regarding Hinsdale. O'Shea learned of the Hinsdale report after Plaintiffs' employment ended.

Plaintiffs made late deliveries and pickups on several occasions. First, Plaintiffs were late delivering a load on December 7, 2009. Plaintiffs contend that they were late in part because they had not received the proper directions from CRST. O'Shea avers that Plaintiffs were never knowingly provided with bad directions. On December 9, 2009, Plaintiffs were late picking up a load for a second time. Plaintiffs contend that they were late in part because they had a defective trailer. On December 10, 2009, Plaintiffs were again late delivering a load. Plaintiffs contend that they were late in part because they were fatigued and did not know that they could decline to pick up a load. O'Shea disciplined Red Hat and Runearth on December 11, 2009, for delivering the load late. At the time of their discipline, Red Hat admitted that she stayed up with Runearth during the day and that they shut down the truck at night instead of alternating driving and sleeping as a team. Red Hat's failure to drive the truck also contributed to Plaintiffs' late deliveries and pick ups.

On December 11, 2009, Plaintiffs picked up a load in Washington that was scheduled to be delivered in Oklahoma City, Oklahoma, on December 13, 2009. Plaintiffs encountered bad weather in the mountains and did not deliver the load until December 16, 2009. Red Hat and Runearth's employment ended on December 16, 2009, when O'Shea told Red Hat and Runearth to get off the truck in Oklahoma City and Red Hat told O'Shea

that she no longer wanted to be a driver. CRST's personnel records list Red Hat's reason for leaving CRST as "voluntary" and "did not want to be a driver." Termination Record, Def. App'x at 48. O'Shea avers that he did not terminate Red Hat and Runearth's employment, although multiple late deliveries and pickups can result in termination, and that Red Hat and Runearth voluntarily quit their employment with CRST after stating that the driving profession was not for them.

At the time Red Hat and Runearth's employment ended with CRST, CRST deducted the amounts it had advanced to Plaintiffs during their training period from their final paychecks. This deduction resulted in no net pay for Plaintiffs, and Plaintiffs still owe CRST money for the advanced costs.

## VI. ANALYSIS

In the Motion, CRST argues that it is entitled to summary judgment on all seven counts in the Complaint.

### A. Sexual Harassment

CRST argues that it is entitled to summary judgment on Red Hat's claim of sexual harassment in Count I because Red Hat was not subjected to a discriminatorily hostile work environment. Specifically, CRST argues that: (1) the alleged harassment did not affect a term, condition or privilege of Red Hat's employment because the harassment was not so severe or pervasive as to alter the conditions of employment and create a hostile work environment; (2) Hinsdale was not Red Hat's supervisor, so CRST cannot be vicariously liable for his harassment; and (3) even if Hinsdale was Red Hat's supervisor, CRST can establish the affirmative defense that it took prompt remedial measures and Red Hat unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.

In response, Red Hat argues that Hinsdale's actions created a hostile work environment because: (1) Red Hat was subjectively offended by Hinsdale's actions; (2)

CRST is not entitled to the prompt remedial action defense because the defense is only applicable if the Lead Driver is a coworker rather than a supervisor; and (3) Hinsdale was Red Hat's supervisor, so CRST should be held vicariously liable for his actions.

### 1. *Applicable law*

"Title VII . . . makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (internal quotation marks omitted). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Id.* (internal citations omitted) (quoting *Meritor Sav. Bank*, 477 U.S. at 65, 67) (internal quotation marks omitted). However, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Id.*

The Eighth Circuit Court of Appeals has stated:

> [h]ostile work environments created by supervisors or coworkers have the following elements in common: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment. *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). In addition, for claims of

harassment by non-supervisory personnel, [the plaintiff] must
show that [her] employer knew or should have known of the
harassment and failed to take proper action.

*Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006). "The
environment must be both objectively hostile as perceived by a reasonable person and
subjectively abusive as actually viewed by [the plaintiff]." *Anderson v. Durham D & M,
L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010). In examining the objective component, the
court looks to the "totality of the circumstances, 'including the frequency of the
discriminatory conduct, its severity, whether it is physically threatening or humiliating or
a mere offensive utterance and whether the conduct unreasonably interfered with the
employee's work performance." *Id.* at 518-19 (quoting *Singletary v. Mo. Dep't of Corr.*,
423 F.3d 886, 893 (8th Cir. 2005)). The court also considers "the 'physical proximity to
the harasser, and the presence or absence of other people.'" *Id.* at 519 (quoting *Carter v.
Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)).

Although an employer can be held directly liable for sexual harassment by non-
supervisory coworkers if the above five elements are proven, "[an employer] cannot be
vicariously liable for sexual harassment by non-supervisory coworkers." *Alvarez v. Des
Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010). If a supervisor commits the
harassment, the employer will be held vicariously liable for the supervisor's harassment
unless the employer can establish the affirmative *Ellerth-Faragher*[3] defense. *Weger v. City
of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007). To establish the *Ellerth-Faragher* defense,
the defendant must show: (1) that it "exercised reasonable care to prevent and correct
promptly any sexually harassing behavior"; and (2) "that the plaintiff employee
unreasonably failed to take advantage of any preventative or corrective opportunities
provided by the employer or to avoid harm otherwise." *Id.*

---

[3] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca
Raton*, 524 U.S. 775 (1998).

13

## 2.    *Term, condition or privilege of employment*

CRST concedes, for purposes of summary judgment, that Red Hat belongs to a protected group, Red Hat was subjected to unwelcome harassment and a causal nexus exists between the harassment and Red Hat's protected group status.  CRST argues that Hinsdale's harassment did not affect a term, condition or privilege of employment because the harassment was not so severe or pervasive as to alter the conditions of employment and create a hostile work environment.  CRST maintains that Hinsdale's conduct was limited to subjectively offensive statements and a few instances of Hinsdale touching Red Hat.  In response, Red Hat agrees that Hinsdale's actions were subjectively offensive and argues that the question of whether a reasonable person would conclude that the conduct was so severe or pervasive as to alter the conditions of employment is a question for the jury.

The record illustrates that Red Hat found her work environment to be subjectively abusive.  With regard to whether Red Hat's work environment was objectively hostile, the court finds that a reasonable jury could conclude that Hinsdale's actions were objectively so severe and pervasive that they altered the conditions of Red Hat's employment.  Red Hat testified that Hinsdale told Red Hat sexually explicit jokes, touched her hair and shoulders on multiple occasions and one morning Red Hat woke up to Hinsdale touching her backside while she slept.  Thus, a reasonable person could find Hinsdale's conduct to be physically threatening or humiliating and not simply consisting of an offensive utterance. *See Anderson*, 606 F.3d at 519.  Additionally, because Red Hat was alone with Hinsdale living on a semi-truck, Red Hat's physical proximity to Hinsdale and the absence of other people support a finding that Hinsdale's actions altered the conditions of Red Hat's employment. *See id.*  Thus, there is a genuine issue of material fact as to whether Hinsdale's sexually harassing conduct created a hostile work environment.

## 3.    *Coworker vs. supervisor*

The court must now determine whether CRST could be held liable for any hostile

work environment created by Hinsdale. CRST argues that Hinsdale was not Red Hat's supervisor because he did not have the power to hire, fire, promote or reassign Red Hat and, thus, CRST cannot be held vicariously liable for his actions. CRST further argues that, even if Hinsdale was Red Hat's supervisor, CRST can establish an affirmative defense because CRST responded with prompt remedial action and Red Hat unreasonably failed to take advantage of preventative or corrective opportunities that CRST provided.

In response, Red Hat argues that Hinsdale was Red Hat's supervisor because "CRST's practices give Lead Drivers virtually unchecked authority and control over all aspects of a trainee's daily activities, as well as[] authority to recommend whether a trainee is ready for full-driver status, and their recommendations are virtually always followed." Plaintiffs' Brief in Opposition of Defendant's Motion for Summary Judgment ("Plaintiffs' Brief") (docket no. 33-5) at 14. Red Hat also argues that the prompt remedial action affirmative defense is "only applicable if the Lead Driver is concluded to have been a co-worker rather than a supervisor." *Id.* at 13.

### a.      *Whether Lead Driver is a supervisor*

"[T]o be considered a supervisor, 'the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties.'" *Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1057 (8th Cir. 2004). In *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 684 (8th Cir. 2012), the Eighth Circuit considered whether CRST could be held vicariously liable for its Lead Drivers' sexual harassment of trainee drivers. The Eighth Circuit found that a CRST Lead Driver is not a supervisory employee, and, therefore, CRST was "not vicariously liable for any harassment that its Lead Drivers allegedly perpetrated against female trainees." *Id.* at 684. The Eighth Circuit stated that "[t]he fact that an alleged harasser may have been a team leader with the authority to assign employees to particular tasks will not be enough to make that person

a supervisor." *Id.* (quoting *Merritt v. Albemarle Corp.*, 496 F.3d 880, 883 (8th Cir. 2007)) (internal quotation marks omitted). Additionally, with respect to Lead Drivers' ability to make recommendations regarding trainees, the Eighth Circuit stated that "CRST's reliance, in part, on a Lead Driver's evaluation of a trainee's performance to decide whether to promote that trainee to full-driver status is insufficient to render a Lead Driver a supervisor" because there was not evidence that CRST rubberstamped its Lead Drivers' recommendations and "a coworker's authority to make mere recommendations or evaluations to a superior about tangible employment decisions pertaining to a fellow employee does not constructively promote that coworker to a supervisor for purposes of vicarious Title VII liability." *Id.* at 685 (emphasis omitted).

The factual circumstances of the instant action are nearly identical to the facts at issue in *EEOC*. Although Hinsdale had the authority to make recommendations to CRST management about Red Hat based on her performance during the training period, he did not have the power to hire, fire, promote or reassign her to significantly different duties. Thus, Hinsdale did not have the power to take tangible employment action against Red Hat such that he can be deemed a supervisor for purposes of Title VII liability. *See id.* at 684.

Red Hat asserts that the factual circumstances of this case differ from those in *EEOC* because Red Hat's second Lead Driver, Seigler, recommended to CRST management that Red Hat move on to co-driving with her husband before she had completed all of her training miles and CRST accepted the recommendation. This fact does not illustrate that Seigler or any other Lead Driver had authority over tangible employment decisions beyond mere recommendations, and Red Hat has not demonstrated that CRST rubberstamped such recommendations. *See id.* at 684-85. Based on the Eighth Circuit's reasoning in *EEOC*, the court finds that Hinsdale was not Red Hat's supervisor and, therefore, CRST cannot be held directly liable for Hinsdale's actions unless Red Hat can show that CRST knew or should have known of the harassment and failed to take

proper action.

### b. Whether CRST knew or should have known of the harassment and failed to take proper action

Because Hinsdale was not Red Hat's supervisor, "'[CRST] may be directly liable for its employees' actions that violate Title VII if the company knows or should have known of the conduct, unless it can show that it took immediate action and appropriate corrective action.'" *Id.* at 690 (quoting *Alvarez*, 626 F.3d at 419) (alteration in original) (emphasis omitted). "Where an employer takes 'prompt remedial action that is reasonably calculated to stop the harassment,' the employer is not liable under Title VII for the underlying sexual harassment." *Alvarez*, 626 F.3d at 419 (quoting *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1123 (8th Cir. 2007)).

> Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and the remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment.

*Carter*, 173 F.3d at 702 (internal citations omitted).

Prior to November 11, 2009, the only CRST employees Red Hat had talked to regarding Hinsdale's behavior were Runearth, Stanolis and Cindy. None of these CRST employees were supervisors and none of them informed human resources or CRST management about Hinsdale's actions. In fact, Red Hat repeatedly said that she did not want to report Hinsdale because she did not want to cause a problem or get into trouble. Therefore, there is no evidence that CRST knew or should have known of the harassment before Red Hat contacted her dispatcher on November 11, 2009. *See Moore v. Neb. Beef, Ltd.*, 449 F. App'x 540, 541 (8th Cir. 2011) (per curiam) (affirming summary judgment on the plaintiff's hostile work environment claim because "nothing in the record suggested

that [the defendant] knew or had reason to know [the plaintiff] had been mistreated by co-workers based on his race, color, or sex").

The evidence also shows that CRST took immediate and appropriate corrective action. Red Hat called her dispatcher at approximately 10:30 P.M. on November 11, 2009, and reported Hinsdale's harassment. The dispatcher transferred Red Hat to his supervisor, Wright, and Wright took immediate action to get Red Hat away from Hinsdale, including paying for Red Hat's taxi and hotel. The next morning, Oetkin began her investigation by interviewing Red Hat. That same day, CRST assigned Red Hat to another Lead Driver, and Red Hat was on the truck with her new female Lead Driver that night. Hinsdale was subsequently disciplined with a written notation in his file, and he was no longer allowed to train female drivers. Oetkin then informed Red Hat of the results of her investigation and Hinsdale's discipline. Red Hat even testified that she was satisfied with the way CRST handled her report of harassment when she made it. Red Hat Deposition, Def. App'x at 33-34. Therefore, no reasonable jury could find that CRST did not take immediate and appropriate corrective action once Red Hat made her report. *See Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 633 (8th Cir. 2000) (holding that summary judgment was proper because "no rational jury could find that [the defendant's] response was neither prompt or adequate"). The court finds that there is no genuine issue of material fact regarding whether CRST knew of should have known about the harassment or took immediate and appropriate remedial action once it became aware of the harassment. Thus, Red Hat has failed to meet her burden to establish the elements required for a coworker sexual discrimination claim, and the court shall dismiss Count I on this ground.

### c. *Affirmative defense*

Even if the court were to hold that Hinsdale was Red Hat's supervisor, CRST can establish the *Ellerth-Faragher* affirmative defense. While Red Hat is correct that the prompt remedial action prong of a hostile work environment claim only applies to actions

involving non-supervisory employees, the *Ellerth-Faragher* defense is applicable to actions involving supervisory employees. "The first element of the affirmative defense imposes two requirements on employers, they must have (1) exercised reasonable care to prevent sexual harassment (the 'prevention prong') and (2) promptly corrected any sexual harassment that did occur (the 'correction prong')." *Weger*, 500 F.3d at 719. The Eighth Circuit has held that "an employer exercised reasonable care to prevent harassment where it distributed its antiharassment policy to all of its employees, and the policy's complaint procedure 'identifie[d] three company officials to whom harassment [could be] reported." *Id.* at 719-20 (quoting *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1195 (8th Cir. 2006)) (alteration in original). "The correction prong requires [the defendant] to demonstrate that it 'exercised reasonable care . . . to correct promptly any sexually harassing behavior.'" *Id.* at 720 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).

"[T]o satisfy the second element of the *Ellerth-Faragher* affirmative defense, the [defendant] must show that 'the [plaintiff] unreasonably failed to take advantage of any preventative or corrective opportunities provided by the [defendant] or to avoid harm otherwise.'" *Id.* at 724. "'[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.'" *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 745 (1998)); *see also Adams v. O'Reilly Auto., Inc.*, 538 F.3d 926, 932 (8th Cir. 2008) ("A showing that an employee failed to avail him- or herself of a proper complaint procedure 'will normally suffice to satisfy the employer's burden under the second element of the defense.'" (quoting *Faragher*, 524 U.S. at 807-08)). "[T]here is no bright-line rule as to when a failure to file a complaint becomes unreasonable . . . ."

*Weger*, 500 F.3d at 724 (quoting *Reed v. MBNA Mktg. Sys., Inc.*, 333 F.3d 27, 35 (1st Cir. 2003)). "'[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment.'" *Id.* at 725 (quoting *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2005)).

First, the evidence shows that CRST provided Red Hat with a copy of its harassment policy, which includes instructions to contact a fleet manager or Human Resources if the employee has been subjected to conduct which may be harassment. Red Hat signed a form stating that she had received and understood the policy. Therefore, the prevention element of the first prong of the defense is satisfied. *See id.* at 719.

Second, as discussed above, CRST took prompt remedial action to correct the sexually harassing behavior. CRST immediately removed Red Hat from Hinsdale's truck and reassigned her to a female Lead Driver. CRST also promptly investigated the matter and disciplined Hinsdale. Therefore, the correction element of the first prong of the defense is satisfied. *See id.*

Third, the evidence shows that, although Red Hat signed an acknowledgment that she would immediately report any harassment to CRST, she waited weeks before reporting Hinsdale's harassing behavior to CRST. Although the delay of her report was relatively short, given that Hinsdale and Red Hat were living alone together on a truck, it was not reasonable for Red Hat to delay reporting Hinsdale's actions to CRST. Red Hat's husband and trainee friends urged her to report the harassment, but she refused due to her fears of retaliation. However, Red Hat's subjective fears of retaliation were not sufficient to alleviate her duty to report the harassment to CRST. *See id.* at 725.

Based on the above discussion, CRST has established its affirmative defense because it exercised reasonable care to prevent and promptly correct any sexually harassing behavior and Red Hat unreasonably failed to take advantage of any preventative or

corrective opportunities provided by the employer or to avoid harm otherwise prior to her initial report to CRST. Therefore, even if Hinsdale was Red Hat's supervisor, CRST cannot be held liable for his actions because CRST has established an affirmative defense. Thus, the court shall dismiss Count I.

### B. Racial Harassment

CRST argues that it is entitled to summary judgment on Red Hat's racial harassment claim in Count II because the claim is based on Hinsdale's sporadic comments about Mexicans that were not directed at Red Hat and Hinsdale never made disparaging comments about Native Americans. In response, Red Hat argues that there is a genuine issue of fact regarding whether Red Hat was subjected to severe and pervasive harassment during the time she was training with Hinsdale.

To establish her Title VII hostile work environment claim based on racial harassment, Red Hat must prove the same elements as required to prove her sexual harassment claim, namely: "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Gordon*, 469 F.3d at 1194-95. "A hostile work environment exists when the workplace is dominated by racial slurs, but not when the offensive conduct consists of offhand comments and isolated incidents." *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004); *see also Anderson*, 606 F.3d at 519 ("'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" (quoting *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006))).

Based on the evidence, there is no support for Red Hat's claim that racial harassment affected a term, condition or privilege of employment because she was not subjected to severe or pervasive racial discrimination. Red Hat's claim rests solely on a

few comments that Hinsdale made to his dispatcher, namely, calling drivers of other vehicles "slow-ass Mexicans" and "dumb-ass Mexicans" and his general derogatory comments about a customer who was not Caucasian. The comments were not directed at Red Hat, and Hinsdale never made disparaging remarks about Native Americans. *See Bainbridge*, 378 F.3d at 760 (holding that sporadic remarks that were not directed at the plaintiff did not constitute harassment so severe or pervasive that it altered the terms or conditions of employment); *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1018 (8th Cir. 2011) (holding that summary judgment was appropriate because a coworker's one-time use of a racial slur that was not directed at the plaintiff was not sufficient to support a hostile work environment claim).

Red Hat appears to argue in her brief that the court should consider all of Hinsdale's harassing conduct in assessing whether there is a genuine issue of material fact regarding Red Hat's racial harassment claim. However, the court has considered Hinsdale's sexual harassment conduct in relation to Count I and will only consider Hinsdale's racially-motivated conduct in assessing Red Hat's claim in Count II.

The court finds that no reasonable jury could find that Hinsdale's sporadic comments about Mexicans were sufficiently severe and pervasive as to alter a term or condition of Red Hat's employment. Thus, there is no genuine issue of material fact regarding Red Hat's racial harassment claim, and the court shall dismiss Count II.

### C. Retaliation

CRST argues that it is entitled to summary judgment on Red Hat's retaliation claim in Count III because: (1) Red Hat did not suffer a materially adverse employment action because she quit her employment with CRST; and (2) there is no causal connection between Red Hat leaving her employment with CRST and her sexual harassment complaint. In response, Red Hat argues that: (1) CRST constructively discharged her because the hostile work environment made it impossible for Plaintiffs to continue working

for CRST; and (2) the constructive discharge is causally connected to Red Hat's harassment complaint because, after the complaint, she was subjected to discipline by managers and retaliatory conduct from dispatchers.

"Title VII makes it unlawful for an employer to discriminate against an employee because she has 'opposed any practice made an unlawful employment practice,' or has made a charge or participated in an investigation or proceeding under the statute." *Alvarez*, 626 F.3d at 416 (quoting 42 U.S.C. § 2000e-3(a)). "A prima facie case of unlawful retaliation requires a showing that the employee engaged in some form of protected activity, that the employee was subject to adverse employment action, and that the adverse action was causally connected to the protected activity." *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 845 (8th Cir. 2002); *see also Alvarez*, 626 F.3d at 416 ("A plaintiff must show that the protected conduct was a determinative factor in the employer's materially adverse employment action."). "The defendant may then rebut the plaintiff's case by advancing a legitimate, nonretaliatory reason for the adverse employment action." *Rheineck v. Hutchinson Tech., Inc.*, 261 F.3d 751, 757 (8th Cir. 2001). "If the defendant makes this showing, the plaintiff must show that the defendant's proffered reason was a pretext for illegal discrimination." *Id.*

"A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation." *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928 (8th Cir. 2004). "'[A] constructive discharge arises only when a reasonable person would find conditions intolerable.'" *Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467, 472 (8th Cir. 1990) (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir. 1981)). "In addition, 'the employer's actions must have been taken with the intention of forcing the employee to quit.'" *Id.* (quoting *Johnson*, 646 F.2d at 1256).

First, the court finds that Red Hat was not subject to an adverse employment action.

Given the facts of this case, a reasonable jury could not conclude that CRST terminated Red Hat. CRST's personnel records list Red Hat's reason for leaving CRST as "voluntary" and "did not want to be a driver." Termination Record, Def. App'x at 48. When asked during her deposition about her reason for voluntarily leaving, Red Hat stated that, after O'Shea told her that driving was not for her, she agreed that she no longer wanted to be a driver. O'Shea avers that he did not terminate Plaintiffs but that they voluntarily left their employment. Red Hat points to Runearth's deposition testimony, in which he stated that O'Shea told Plaintiffs to get off the truck and indicated that it was his belief that his employment had been terminated at that point. Runearth appears to acknowledge, however, that no CRST official told Plaintiffs that their employment was terminated. Based on Red Hat's testimony, CRST's personnel records and O'Shea's affidavit, a reasonable jury could not find that CRST terminated Red Hat's employment.

Furthermore, a reasonable jury could not conclude that CRST constructively discharged Red Hat. Red Hat claims that the dispatchers gave Plaintiffs bad driving directions and refused to respond to Plaintiffs' communications in retaliation for her harassment claim against Hinsdale because, as Hinsdale told Red Hat, the dispatchers were Hinsdale's friends and "ha[d] his back." Red Hat Deposition, Def. App'x at 14. Red Hat also claims that O'Shea disciplined Plaintiffs as a result of her harassment complaint. However, Red Hat does not present any evidence beyond conjecture that the dispatchers or O'Shea even knew about her complaint against Hinsdale, let alone that their actions were the result of such complaint. O'Shea avers that he did not learn of Red Hat's harassment complaint until after she was no longer employed at CRST. Additionally, Red Hat presents no evidence that the dispatchers and O'Shea acted with the intent to force Red Hat to quit or could have reasonably foreseen that she would quit as a result of their actions. *See Smith*, 895 F.2d at 472. Therefore, a reasonable jury could not find that CRST constructively discharged Red Hat.

Second, even if Red Hat was subject to an adverse employment action, she has failed to establish that there was a causal relationship between the employment action and her report of harassment. Red Hat argues generally that "a number of incidents and circumstances spread over several days . . . taken together, forms a complex tapestry of discrimination." Plaintiffs' Brief at 19. Red Hat also states that her employment ended only a few weeks after Hinsdale harassed her. However, as discussed above, there is no evidence that the dispatchers or O'Shea even knew about Red Hat's harassment report. Additionally, Red Hat's discipline came after Plaintiffs delivered multiple loads late and Red Hat admitted that Plaintiffs were not driving as a team. Regarding bad driving directions, Seigler states that "CRST dispatchers are notorious for giving bad or incorrect directions," Seigler Affidavit, Plaintiffs' Appendix (docket no. 33-3) at 57, indicating that Plaintiffs were not the only drivers to receive bad driving directions. Red Hat presents no evidence beyond conjecture that there was a causal connection between the dispatchers' actions, her discipline from O'Shea and her harassment complaint. Therefore, a reasonable jury could not find that an adverse employment action was causally related to Red Hat's harassment report. *See Alvarez*, 626 F.3d at 416.

Finally, even if Red Hat could establish the elements of a retaliation claim, CRST has shown that it had a legitimate, nonretaliatory reason for the adverse employment action. On December 7, 2009, Plaintiffs were late delivering a load. On December 9, 2009, Plaintiffs were late picking up a load. On December 10, 2009, Plaintiffs were late delivering a load. On December 11, 2009, Plaintiffs were disciplined for delivering a late load. At the time of this discipline, Plaintiffs admitted that they were not driving as a team pursuant to CRST's practices and, instead, Red Hat was staying up with Runearth and both were sleeping at night, thus losing driving time. On December 16, 2009, Plaintiffs were again late delivering a load. Under CRST company policy, an employee may be terminated for repeated late deliveries. Therefore, CRST has illustrated that, if CRST did

discharge Red Hat, it had a legitimate, nonretaliatory reason for doing so. Red Hat does not provide any evidence that CRST used her poor work performance as a pretext for firing her because of the harassment complaint. *See Rheineck*, 261 F.3d at 757.

Based on the foregoing, there is no genuine issue of material fact regarding Red Hat's retaliation claim, and the court shall dismiss Count III.

### D. Breach of Contract

CRST argues that it is entitled to summary judgment on Plaintiffs' breach of contract claim in Count IV because, under the terms of the contract, CRST correctly deducted the amounts it advanced to Plaintiffs from Plaintiffs' paychecks, resulting in zero net income on Plaintiffs' paychecks. In response, Plaintiffs argue that CRST never gave Plaintiffs a reason for withholding all of their wages and that Plaintiffs did not voluntarily leave their positions. Plaintiffs also argue that CRST breached the terms of the contracts when Hinsdale sexually harassed Red Hat.

"In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach." *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).[4] "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Id.*

There is no genuine issue of material fact regarding whether CRST breached its contracts with Plaintiffs because there is no evidence that CRST failed to perform any promise in the contracts with Plaintiffs. First, as discussed above, CRST cannot be held directly or vicariously liable for Hinsdale's harassment of Red Hat. Therefore, the

---

[4] Because the employment contracts state that Iowa law governs the contracts, the court shall apply Iowa law.

harassment itself cannot be the basis for a breach of contract action.

Second, there is no evidence that CRST breached its contracts with Plaintiffs regarding payment. Red Hat admitted during her deposition that CRST did what it said it was going to do in its contract and that she did not do what she promised in the contract because she failed to finish her driving term. Red Hat Deposition, Def. App'x at 36-37. Runearth also testified that he and Red Hat each owe CRST approximately $4,000 for the driving school. Runearth Deposition, Def. App'x at 63. Plaintiffs' employment contracts state that, if the employee breaches the contract or the employee is terminated for due cause, CRST is authorized to deduct the amount owed for advancements from the employee's final paycheck. Plaintiffs' paychecks from December 21, 2009, show earnings of $208.34 and deductions for an advance, bus fare, housing and a physical/drug screen totaling $536.00, which resulted in zero net pay for Plaintiffs and a deficit of $343.60. Plaintiffs fail to produce any evidence that CRST breached its contracts with Plaintiffs by failing to pay them. In fact, it appears that CRST performed in accordance with the terms of the contracts. Additionally, Plaintiffs cannot show that they performed as required under the contracts because, as admitted by Red Hat and Runearth, they did not finish their driving terms with CRST and still owe CRST money. *See id.*

Because there is no genuine issue of material fact regarding whether CRST breached its contracts with Plaintiffs, the court shall dismiss Count IV.

### E. Promissory Estoppel

CRST argues that it is entitled to summary judgment on Red Hat's promissory estoppel claim in Count V because the CRST driver contract did not promise continued employment with CRST and Plaintiffs voluntarily left their employment with CRST. In response, Red Hat argues that CRST never reimbursed her for her November 11, 2009 taxi and hotel as Wright had promised and that her promissory estoppel claim is appropriate because this promise is not in the contract.

The elements of a promissory estoppel claim are:

> (1) a clear and definite promise; (2) the promise was made
> with the promisor's clear understanding that the promisee was
> seeking an assurance upon which the promisee could rely and
> without which he would not act; (3) the promisee acted to his
> substantial detriment in reasonable reliance on the promise;
> and (4) injustice can be avoided only by enforcement of the
> promise.

*Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 49 (Iowa 1999).[5]

Red Hat cannot establish that there is a genuine issue of material fact regarding her claim that CRST promised to pay for the hotel and taxi because there is no evidence that CRST did not pay for the hotel and taxi. In fact, Red Hat testified during her deposition that CRST paid for the November 11, 2009 taxi and hotel. *See* Red Hat Deposition, Def. App'x at 27. Therefore, the court shall dismiss Count V.

### F. Iowa Wage Payment Collection Law

CRST argues that it is entitled to summary judgment on Plaintiffs' Iowa Wage Payment Collection Law ("IWPCL") claim in Count VI because "CRST paid Plaintiffs all sums due and owing them per the terms of their Driver Contracts." Defendant's Brief in Support of Motion for Summary Judgment (docket no. 26-3) at 28. CRST argues that it deducted the amounts it advanced to Plaintiffs for education, transportation, pre-employment screening and other expenses from their paychecks, resulting in zero net pay for Plaintiffs. Plaintiffs state that they "concede this claim for purposes of payment under the Iowa Wage Payment Collection Law." Plaintiffs' Brief at 22.

---

[5] The parties do not contest that Iowa law applies to Plaintiffs' promissory estoppel and retaliatory discharge claims. Because CRST is an Iowa corporation and the relationship between the parties is centered in Iowa, the court shall apply Iowa law. *See Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897-98 (Iowa 1996) (listing factors the court considers in determining which state has the most significant relationship to the cause of action).

The IWPCL states that "[a]n employer shall pay all wages due its employees." Iowa Code section 91A.3. The court finds that, pursuant to Plaintiffs' employment contracts, CRST deducted the amounts that it advanced to Plaintiffs from their final paychecks. Therefore, CRST did not fail to pay wages due to Plaintiffs. Additionally, Plaintiffs do not resist the Motion with respect to their IWPCL claim. Thus, the court shall dismiss Count VI.

### G. Retaliatory Discharge

CRST argues that it is entitled to summary judgment on Runearth's retaliatory discharge claim in Count VII because: (1) Runearth was not terminated, but instead he quit; (2) Runearth did not engage in any protected activity; and (3) common law claims of wrongful discharge based on employment discrimination are preempted by the Iowa Civil Rights Act ("ICRA") and Runearth's claim would be dismissed under Title VII of the ICRA for failure to exhaust his administrative remedies. In response, Runearth argues that he was constructively discharged but does not respond to CRST's arguments that he was not engaged in any protected activity and that the common law retaliatory discharge claim is preempted.

> An employee asserting a wrongful-discharge claim based on violation of public policy must satisfy the court as to all of the following factors:
> (1)    The existence of a clearly defined public policy that protects an activity.
> (2)    This policy would be undermined by a discharge from employment.
> (3)    The challenged discharge was the result of participating in the protected activity.
> (4)    There was lack of other justification for the termination.

*Davis v. Horton*, 661 N.W.2d 533, 535 (Iowa 2003); *see also Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 281 (Iowa 2000) ("We have identified the elements of an action to recover damages for discharge in violation of public policy to require the

employee to establish (1) engagement in a protected activity; (2) discharge; and (3) a causal connection between the conduct and the discharge."). Regarding the causal connection element, "[t]he protected conduct must be the determinative factor in the decision to terminate the employee." *Fitzgerald*, 613 N.W.2d at 289.

First, as discussed above, Runearth cannot establish that he was terminated or constructively discharged from CRST. Second, even if CRST terminated Runearth's employment, he cannot establish that he participated in the protected activity. Red Hat made the harassment claim based on Hinsdale's conduct toward her. Runearth never made a harassment claim on behalf of his wife or engaged in any other protected conduct that would satisfy the requirement that Runearth participated in a protected activity. Runearth does not point to, and the court is unaware of, any case law supporting the argument that a spouse's protected activity can be transferred for the purposes of a retaliatory discharge claim. *Cf. Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998) (rejecting the plaintiff's argument that "a plaintiff bringing a retaliation claim need not have personally engaged in statutorily protected activity if his or her spouse or significant other, who works for the same employer, has done so" and holding that "a plaintiff bringing a retaliation claim under Title VII must establish that she personally engaged in the protected conduct"). Third, as discussed above, there is no causal connection between Red Hat's report of harassment and Runearth's departure from CRST. Finally, as discussed above, CRST can show that any termination was the result of Runearth's poor work performance and not Red Hat's report of sexual harassment. Because Runearth cannot establish a claim for retaliatory discharge in violation of public policy, the court need not address whether Runearth's claim would be preempted by the ICRA. Therefore, because there is no genuine issue of material fact regarding whether Runearth suffered a retaliatory discharge in violation of public policy, the court shall dismiss Count VII.

## VII. CONCLUSION

In light of the foregoing, CRST's Motion for Summary Judgment (docket no. 26) is **GRANTED**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant CRST Van Expedited, Inc. and against Plaintiffs Ona S. Red Hat and Leo Runearth and **CLOSE THIS CASE**.

**DATED** this 16th day of October, 2012.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA